FILED

2026 Mar-24  PM 02:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

**ROBERT EARL COUNCIL,**
                Plaintiff,

v.                                                      **Case No.: 2:22-CV-008-CLM-HNJ**

**WEXFORD HEALTH**
**SOURCES INC.,**
                Defendant.

## MEMORANDUM OPINION

A jury found that Wexford Health Sources, Inc., violated Robert Earl Council's Eighth Amendment right against cruel and unusual punishment and awarded Council $50,000 in compensatory damages and $150,000 in punitive damages under 42 U.S.C. § 1983. Wexford Health asks the court to either grant it judgment on Council's § 1983 claim under Rule 50(b) or grant it a new trial under Rule 59(a). For the reasons explained within, the court **GRANTS** Wexford's Rule 50(b) motion for judgment and thus **DENIES AS MOOT** its Rule 59(a) motion for a new trial. Because discarding a jury's verdict is a rare, drastic remedy, the court starts by explaining what makes this case different.

### I.

### COUNCIL'S SHIFTING THEORIES

The jury found that Wexford Health's decisionmaker at Kilby Prison, Dr. Wilcotte Rahming, was deliberately indifferent to Council's serious medical needs. So the court's post-trial task is to determine whether the trial evidence supports a finding that Dr. Rahming acted with "criminal recklessness" by performing an act, or failing to perform an act, that Dr. Rahming knew put Council at "substantial risk of serious harm." *Wade v. McDade*, 106 F. 4th 1251, 1258 (11th Cir. 2024) (en banc). That begs the question: What act or omission did the jury find was criminally reckless? The court cannot say because Council has changed the criminally reckless act so many times that it feels like playing a game of Whack-a-Mole: when you swing at one target, it disappears and another pops up to replace it. To demonstrate, the following chart shows the alleged act of criminal recklessness as it evolved before, during, and after trial:

| Timing of Allegation | Alleged Act(s) of Deliberate Indifference |
|---|---|
| Amended Complaint | For three weeks, no Wexford Health employee saw Council or gave him medicines prescribed by UAB. |
| Interrogatory Answers | For three weeks, no Wexford Health employee gave Council medicine, and Dr. Rahming refused to see Council. |
| Council's Deposition | Dr. Rahming and the nurses saw Council. But for three weeks, Dr. Rahming told the nurses not to give Council any prescribed medicines. Nurse Fuller alone snuck Council Motrin. |
| Pretrial Order | Dr. Rahming did not examine Council, and Dr. Rahming failed to give Council oxycodone as recommended by UAB doctors. |
| Opening Statements | Dr. Rahming failed to give Council oxycodone as recommended by UAB doctors, and Dr. Rahming failed to ensure that Council was sent back to UAB within 5-7 days for a follow-up. |
| Opp. to R50(a) motion + First closing argument | Dr. Rahming did not give Council any medicine within the first day, and Dr. Rahming failed to prescribe methocarbamol for three weeks. |
| Rebuttal closing argument | Dr. Rahming discharged Council too early, then forgot to send him to UAB for his follow-up. |
| Opp. to R50(b) motion | Dr. Rahming discharged Council too early, and Dr. Rahming and nurses failed to provide "sufficient" pain medication, be it oxycodone or some other drug. |

As you can see, Council cycled through at least nine distinct—and often contradictory—acts or omissions before, during, and after trial:

1. No Wexford Health employee saw Council for three weeks.

2. No Wexford Health employee gave Council pain medication for three weeks.

3. While Wexford Health nurses saw Council, Dr. Rahming failed to examine Council for three weeks.

4. Both Dr. Rahming and nurses saw Council on his first day (02-01) but failed to give him any pain medicine until Day Two (02-02).

5. Dr. Rahming refused to prescribe Council any pain medicine for three weeks, and Dr. Rahming ordered nurses not to give him any. Nurse Fuller violated this order by sneaking Motrin to Council.

6. Dr. Rahming prescribed Council with OTC medicines like Advil, Motrin, and Tylenol, but not oxycodone as UAB recommended.

7. Dr. Rahming failed to prescribe Council with medicines stronger than Advil or Motrin, although Dr. Rahming didn't necessarily have to prescribe oxycodone as opposed to other strong medicines.

8. Dr. Rahming discharged Council from his care into DOC's care too early.

9. Dr. Rahming failed to ensure that Council was sent back to UAB within 5-7 days for his follow-up at the eye clinic.

In both this list and the chart on the previous page, the court highlights in yellow the factual claims of deliberate indifference that Council wrote for the pretrial order because under Rule 16(d) and Eleventh Circuit precedent, the pretrial order "controls" Council's claim and Wexford Health's defenses to that claim at trial. *See Morro v. City of Birmingham*, 117 F.3d 508, 515-16 (11th Cir. 1997). Council not only strayed from the limited fact theory he chose during trial, he and his attorney presented different fact theories to the jury.

Consistent with his complaint and the fact dispute that survived summary judgment, Council testified that Wexford Health nurses told him that Dr. Rahming had not prescribed Council *any* pain medication and thus the nurses gave Council *no* pain medication for three weeks, with one

exception: Nurse Fuller snuck Council some Motrin on February 12th.

But Council's attorney did not embrace his client's testimony that the medical records were wrong and everyone was mistaken. Consistent with the pretrial order, he instead pointed out in opening statements that while medical records would show that Dr. Rahming prescribed Council acetaminophen (Tylenol) and ibuprofen (Advil or Motrin), and the nurses gave Council those medicines several times, Dr. Rahming did not prescribe Council oxycodone (opioids) as recommended by UAB. But in his first closing argument, Council's attorney shifted, never mentioning oxycodone and instead focusing on the fact that Dr. Rahming testified that he also prescribed methocarbamol (muscle relaxers), but Wexford Health failed to produce a methocarbamol prescription as an exhibit, so Dr. Rahming must be lying. Then in his rebuttal closing argument, Council's attorney shifted a second time by arguing that Dr. Rahming was deliberately indifferent because he discharged Council from his care after one day and failed to make sure that Council was returned to UAB for a follow-up eye appointment. Now, in his brief in opposition to Wexford Health's posttrial motions, Council's attorney repudiates both (a) his client's version of events that got this case past summary judgment *and* (b) the theory of the case that he wrote for the pretrial order and gave in opening statements.

Council's erraticism creates a dilemma for the court: How can the court judge whether any trial evidence supports the jury's finding that Dr. Rahming subjectively knew that one of his acts or omissions subjected Council to a risk of serious harm if the court doesn't know which act or omission to review? The court starts by enforcing its pretrial order and Rule 16 to "put steel behind the terms of pretrial orders" and ensure fair and orderly trials. *Morro*, 117 F.3d at 515. But to be safe, the court also reviews every other fact theory Council cycled through. By the end, you will see that (a) neither factual theory of deliberate indifference that Council put in the pretrial order is supported by the evidence and, (b) even if Council had not waived them, no other fact theory would support the jury's verdict. So even though the court enforces Rules 16(d) and 16(e), the result would be the same if the court judged every fact theory that Council argued at trial and in post-trial briefing against Rule 50(b).

4

## II.

## BACKGROUND

In this section, the court details the long and winding road of Council's theory of deliberate indifference to cull out the viable theories under Rule 16.

### A. The lawsuit

Council was beaten in the head, shoulders, and back by officers at the Donaldson Correctional Facility on January 30, 2021. Having suffered serious injuries, particularly to his head and left eye, Council was flown to UAB hospital, where he remained until February 1, 2021. That afternoon, Council was taken to the infirmary at Kilby Correctional Facility, where he remained until he returned to UAB on February 22, 2021. Wexford Health provided the health care for Kilby inmates. Dr. Rahming led the on-site Wexford team.

1. *The complaint*: Council sued the officers who beat him at Donaldson and Wexford Health. Council settled with the officers, *see* (doc. 53), so Wexford Health is the lone defendant.

In his complaint, Council alleged that no Wexford Health employee saw him or gave him medication from February 1 through February 22:

> For the next three weeks, from February 1 to February 22, plaintiff did not see any medical personnel, despite swelling and pain from the blow to his eye and despite Wexford's contractual obligation to tend to his medical needs. Additional surgery was to be performed at UAB and, to prepare for the operation, doctors there had prescribed medication to reduce the swelling in his eye, to drain the fluid and to reduce plaintiff's pain. Plaintiff was not provided that medication for those three weeks, which caused him to endure severe and unnecessary pain that could have been reduced had he been provided the prescribed medication. During that time, plaintiff had no vision in his left eye.

(Doc. 31, ¶ 16) (footnote omitted) (highlighting added).

Council pleaded one count against Wexford Health (Count III), alleging that Wexford violated 42 U.S.C. § 1983 by being deliberately indifferent to

5

Council's serious medical needs in violation of his Eighth Amendment right against cruel and unusual punishment:

> 26.  Plaintiff's injuries were so severe that even a lay person would have recognized his need for medical care and pain treatment. The fact that trained medical personnel failed to provide such care makes their indifference even more egregious.
>
> 27.  Plaintiff alleges that Wexford's employees, acting at its direction and subject to its control, were deliberately indifferent to his medical needs, particularly to his need for prescribed pain medication, for the period from February 1 to February 22, 2021, in violation of his Eighth Amendment right not to be subjected to cruel and unusual punishment.

(Doc. 31, ¶¶ 26-27)(footnote omitted).

Rather than file a Rule 12 motion, Wexford Health answered Council's complaint and denied the fact allegations. (Doc. 36). So the parties entered discovery with Wexford Health believing that it had to disprove Council's allegations that (a) no Wexford Health personnel saw Council for three weeks and (b) Council was not given any medicine for three weeks, despite UAB's list of recommended prescriptions.

2. *Discovery*: Wexford Health produced medical records that suggested Dr. Rahming saw Council the day after Council arrived at Kilby (February 2); Dr. Rahming prescribed Council acetaminophen or ibuprofen that day; and, Wexford nurses gave Council the prescribed pain medicines on February 2, 4, 5, 8, and 12. (Docs. 69-3, 69-5). After receiving these records, Council nevertheless responded like this to Wexford Health's interrogatories about the care he received: "Defendant refused to provide him pain medication despite the fact plaintiff suffered a beating that was nearly fatal and severe pain that was ignored." (Doc. 69-2, p.4) (answer to Interrogatory #6). Council went on: "Plaintiff does not know the names of pain medications, if any, prescribed at the hospital. Because defendant did not provide him any, no medications were prescribed during the relevant time period of 2/1/2021-2/22/2021." *Id*. (answer to Interrogatory # 7).

6

Wexford Health confronted Council with the records at his deposition. Council firmly denied that he received the medicines logged in the records:

Q.   So the medical records show and you can't recall that -- on that -- on the 2nd that you received Tylenol 325 milligrams and you say you can't recall getting that, correct?

A.   No, sir.

Q.   If the medical records show that on February the 4th, which would have been the third day that you were there, that you received Tylenol 325 milligrams and Ibuprofen 200 milligrams.  Do you remember getting that?

A.   No, sir, I do not.

Q.   And the medical records show that on February the 5th, 2021, that you received Tylenol 325 milligrams?

A.   No, sir, I do not recall that.

Q.   You're saying that didn't happen or you just don't recall?

A.   I'm saying that didn't happen.

Q.   So the medical records have been put in there improperly or something?

MR. GESPASS:  Object to the form.

Page 80

BY MR. PIGGOTT:

Q.   Or somebody misrepresented, according to Mr. Council, your medical chart?

A.   What I am saying is that I didn't receive any medical pills for the pain that I complained of for days.

Q.   Not on February the 2nd or the 4th or the 5th?

A.   Not that I recall.

(Doc. 71-1, p. 21) (circles added).

7

Contrary to his complaint, Council testified that nurses and Dr. Rahming examined him outside of his cell on Council's first day at Kilby. (*id.*, pp. 16, 18). But Council testified that "every nurse that I talked to told me that they couldn't give me anything because the doctor hadn't prescribed anything, but I kept complaining and complaining and Nurse Fuller gave me Ibuprofen." (*Id.*, pp. 19-20). Council maintained that Nurse Fuller's production of ibuprofen—medicine that Council said Nurse Fuller provided against Dr. Rahming's orders—was the only medication he received while at Kilby. (*Id.*).

3. *Summary judgment*: After discovery ended, Wexford Health moved for summary judgment under Rule 56. Rather than seek judgment by arguing that there was no genuine fact dispute over deliberate indifference, Wexford Health asked the magistrate judge to rule that a single instance of deliberate indifference (*i.e.*, Dr. Rahming's treatment of Council) cannot prove the policy or custom needed to establish municipal liability under *Monell v. Dep't of SOC, Servs.*, 436 U.S. 658 (1978). (Doc. 69). Council limited his response to this issue, arguing that "a single act authorized by a policy maker can constitute government policy" and that Dr. Rahming was Wexford Health's "policy maker." (Doc. 71, p. 3) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)). So the question of whether any facts could prove that Dr. Rahming acted with deliberate indifference was not presented to the magistrate judge; only the question of whether Dr. Rahming's treatment of Council alone could impose 'delegation' liability on Wexford Health. *See* (doc. 77, p. 17, n.22).

Following *Pembaur, supra,* and *Mandel v. Doe*, 888 F.2d 783, 791 (11th Cir. 1989), the magistrate judge found that "Dr. Rahming acted with final policymaking authority for Wexford regarding medical care at the Kilby Correctional Facility." (Doc. 77, pp. 28-31). The magistrate judge then found that a reasonable juror could find that, as Wexford Health's policy maker at Kilby, Dr. Rahming acted with deliberate indifference in one of two ways: (1) if the juror believed Council's testimony, Dr. Rahming did not give Council *any* pain medication for three weeks despite knowing that Council was in serious medical need, and (2) if the juror believed Dr. Rahming and the records, Dr. Rahming did not give Council pain medication during his first 24 hours at Kilby, despite Council's pain level being 10 out of 10. (*Id.*, pp. 39-43). So the magistrate judge recommended that the court deny Wexford Health's Rule 56 motion. (*Id.*, p. 43).

Notably, the magistrate judge said that he would reject Council's suggestion that Dr. Rahming's failure to give him oxycodone, as recommended by UAB doctors, would amount to deliberate indifference. (*Id.*, p. 39, n. 42). But the magistrate did not have to make that ruling because the evidence in a light most favorable to Council could show that Dr. Rahming "failed to prescribe Council *any* pain medication, narcotic or otherwise[.]" (*Id.*).

Wexford Health objected to the magistrate judge's findings (a) that Dr. Rahming's decisions about a single patient can constitute Wexford policy and (b) that, at the Rule 56 stage, the court must take Council's version of events at face value despite the medical records. (Doc. 78). This court overruled the objections and adopted the magistrate judge's report and recommendation.[1] (Doc. 79). Like the magistrate judge, the court found that Council might prove deliberate indifference if he could prove either that (a) Dr. Rahming refused to prescribe any pain medication for three weeks or (b) Dr. Rahming refused to prescribe any medication for more than 24 hours if Dr. Rahming knew that refusal could cause Council serious harm. (*Id.*, p. 3) (citing *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) ("an unexplained delay of hours in treating a serious injury states a prima facie case of deliberate indifference. *See Estelle v. Gamble*, 429 U.S. at 104 & n. 11[.]")).

## C. The Pretrial Order

Consistent with its usual practice, the court allowed the parties to write their own claims and defenses in the pretrial order. In his statement, Council said that, rather than prove either of the genuinely disputed fact scenarios that survived summary judgment, he would instead prove at trial that Dr. Rahming should have given Council oxycodone instead of ibuprofen and acetaminophen—*i.e.*, the fact-based theory that the magistrate judge said he would have granted summary judgment against:

---

[1] In an unpublished opinion, the Eleventh Circuit reversed a district court's granting of summary judgment in a § 1983 deliberate indifference case because the district court found that the interested doctor and nurse's declarations and medical records "completely and clearly contradicted" the plaintiff inmate's testimony. *See Joassin v. Murphy*, 661 Fed. App'x 558, 560 (11th Cir. 2016). So even if this court believed the medical records were accurate when judging Wexford Health's objection to the magistrate's denial of summary judgment, relying on them to grant summary judgment against Council's sworn testimony would have violated Rule 56 and likely resulted in a reversal that added at least one more year to this nearly four year old lawsuit.

(c) Plaintiff's Claims (as written by Plaintiff).

1. Mr. Council claims that from February 1, 2021 through February 22, 2021, while incarcerated at the Kilby Correctional Facility that he was not provided appropriate pain medications for his necessary medical needs and that Wexford had a policy to not provide pain medications and was deliberately indifferent to Mr. Council's necessary medical needs and violated Mr. Council's constitutional rights in violation of 42 U.S.C § 1983. Specifically, Mr. Council alleges that he had been beaten so severely by prison guards that he was unconscious and unresponsive in the prison infirmary, and was therefore airlifted to UAB. Mr. Council alleges that he had been prescribed, among other medications, Oxycodone for pain to be taken as needed. After arriving at Kilby, he reported severe pain to the nursing staff and requested more substantial pain medication than acetaminophen. Mr. Council alleges that Dr. Rahming was told of Mr. Council's complaints, but never examined him and did not prescribe the stronger pain medication he had been prescribed by doctors at UAB hospital, causing him unnecessary pain. He further maintains and alleges that Dr. Rahming had been delegated policy making authority for medical decisions at Kilby and therefore, his decisions constituted Wexford policy.

(Doc. 95, p. 4) (highlighting added). The court added Council's recitation of his claim to the pretrial order and concluded the order with this warning:

It is **ORDERED** that the above provisions be binding on all parties unless modified by further order for good cause shown.

**Done** and **Ordered** on February 3, 2025.

(*Id.*, p. 5) (circle added). Neither party asked to modify the pretrial order before or during trial.

## D. The trial

During his opening statement, Council stuck to the 'failure to give oxycodone' claim he presented in the pretrial order:

> [W]e would expect that he would get medication a little more—a little more than just Tylenol or ibuprofen or Advil, and the evidence is also going to show that the doctor at UAB, in fact, prescribed something. He prescribed oxycodone. However, once at Kilby, he didn't receive that medication. They failed to give it to him. The evidence is also going to show that the doctor at UAB wanted him to be seen at the Lion's Clinic within five to seven days. He didn't get that treatment either. Instead, according to what the defendant is going tell you is they gave Robert Earl ibuprofen or Advil. And he [Council] is going to testify that he does recall one nurse giving him ibuprofen, but it's going to be undisputed that he never got the oxycodone that the doctor at UAB prescribed and that they did not ensure that he had received a follow-up treatment that was suggested in his discharge paperwork. And the question becomes that even though they say they gave him some medication, was that sufficient? Did that meet the standard of care?

(Doc. 120, p. 64). After opening statements, the parties jointly offered the medical records. Council then called his first witness, Wexford Health's former VP of operations Kenneth Dover, who briefly testified that Dr. Rahming "was the ultimate healthcare authority for patient care at Kilby[.]" (*Id.*, p. 70).

Council called only one other witness: himself. Rather than support the theory of the case that he pleaded in the pretrial order and told the jury during opening statements, Council reverted to his deposition testimony that other than Nurse Fuller, the nurses would not give him *any* medication because "they couldn't give me nothing if the doctor hadn't prescribed it and Dr. Rahming hadn't prescribed nothing for medicine—for pain, so they couldn't give me nothing." (Doc. 120, p. 98). When confronted with the medical records that suggested three other nurses gave him ibuprofen and acetaminophen five times before Nurse Fuller saw him on February 12, Council twice testified that

he could not recall getting any medicine from any person other than Nurse Fuller. *See* (*id.*, pp. 93, 105). Council then rested his case.

For its case, Wexford Health called Dr. Rahming and four nurses who, among other things, testified that the medical records correctly reflected that Dr. Rahming prescribed Council acetaminophen and ibuprofen and the nurses gave Council these medicines at least five times:

| | MEDICATION | | HOUR | | | | | |
|---|---|---|---|---|---|---|---|---|
| START 02/02/2021 STOP 02/06/2021 RX 2457456 NA | **Acetaminophen 325mg Tab** SUB FOR: TYLENOL TAKE 2 TABLET(S) ORALLY FOUR TIMES DAILY AS NEEDED FOR PAIN RAHMING, WILCOTTE | | DAY | | 2 | 4 | 5 | |
| | | | TIME | | 10:46 | 19:22 | 11:44 | |
| | | | INITIALS | | TM | TM | TW | |
| | | | QTY | | 2.000 0 | 2.000 0 | 2.000 0 | |
| START 02/02/2021 STOP 02/08/2021 RX 36942667 NA | **Ibuprofen 200mg Tablet** SUB FOR: ADVIL TAKE 1 TABLET(S) ORALLY TWICE DAILY AS NEEDED FOR PAIN RAHMING, WILCOTTE | | DAY | | 4 | | | |
| | | | TIME | | 19:22 | | | |
| | | | INITIALS | | TM | | | |
| | | | QTY | | 1.000 0 | | | |
| START 02/12/2021 STOP 6/2021 RX 668709 NA | **Ibuprofen 200mg Tablet** SUB FOR: ADVIL TAKE 2 TABLET(S) ORALLY TWICE DAILY AS NEEDED FOR PAIN RAHMING, WILCOTTE | | DAY | | 12 | | | |
| | | | TIME | | 22:36 | | | |
| | | | INITIALS | | EG | | | |
| | | | QTY | | 2.000 0 | | | |

(Joint Ex. 31) (circles added). Dr. Rahming also testified that he prescribed Council everything recommended by the UAB doctors except oxycodone. (Doc. 121, pp. 23-24, 44-47). Dr. Rahming testified he did not prescribe oxycodone "[b]ecause I didn't think that his injuries were a significance that warrant that type of treatment, and the nonnarcotic treatment [was] appropriate for him." (*Id.*, p. 23). He added that he suspected Council used illicit drugs, and inmates asking for narcotics is a "worldwide" problem. (*Id.*, p. 25, 36, 38).

12

Once Wexford Health called its last witness, it moved for judgment under Rule 50(a), arguing that Council cannot prove deliberate indifference by merely showing that Dr. Rahming disagreed with UAB doctors about giving Council oxycodone. (Doc. 121, pp. 114-16). Council countered that Dr. Rahming also failed to give him methocarbamol (muscle relaxers) and that Dr. Rahming waited until 6:48pm on Council's second day before giving Council any pain medicine.[2] (*Id.*, pp. 116-117). Under Rule 50(b), the court submitted the issue to the jury, subject to a post-trial ruling on Wexford Health's argument.[3]

During his first closing argument, Council never mentioned oxycodone or his own testimony that Dr. Rahming refused to prescribe him *any* medicine during his three-week stay at Kilby. Rather, Council's attorney accepted that Dr. Rahming prescribed Council pain medication by arguing that Dr. Rahming's February 2 prescription was too delayed under the circumstances:

> But knowing all of that, what did he do? Nothing on the first day except admit him, assuming that he was told about the seriousness of the problem. Nothing until 6:48 on February 2nd did he even prescribe pain medications despite the fact that the night before he was talking about having pain at a level of 10 out of 10. He chose basically to ignore or belittle Robert Earl's complaints of pain and substituted his view that this was okay, there was no problem because oh he had been stabilized. Apparently, as far as Dr. Rahming is concerned, stabilization means pain-free, but that's not what happened in this case.

(Doc. 121, p. 135). Then, in his rebuttal close, Council turned his focus on the failure to return Council to UAB's eye clinic for a follow-up appointment:

> [F]rankly, he may have been seen by Dr. Rahming. I don't know that he was treated by him. What happened was he looked at him and said, oh, he's stable, you know, I am going to discharge him. And then he forgot about him until three weeks later when he said

---

[2] Council's attorney did not argue that his client's testimony supported a finding that Dr. Rahming refused or failed to prescribe him any pain medicine.

[3] Outside the jury's presence, the court questioned Dover and Dr. Rahming and found as a matter of state law that Dr. Rahming was Wexford Health's final decisionmaker for medical decisions at Kilby Correctional Facility. (*Id.*, pp. 119-120).

> oh, gee, we're supposed to have him back at UAB in five to seven days and nothing happened. Let's take look at the—you know, you will see the urgent order for the 22nd, and you will see some physicians note about, oh, we didn't do that in five to seven days. That's not treatment.

(*id.*, p. 142). Council's attorney never argued in closing that Dr. Rahming should have given Council oxycodone as UAB recommended, and he accepted that Dr. Rahming had seen Council on February 2. (*Id.*, pp. 136, 142). In other words, he abandoned both fact-based theories of deliberate indifference that he wrote for the pretrial order.

The court submitted the case to the jury, who submitted these questions for the court:

> 1. Why did the MAR log stop after 2/12?
> 2. Why was flonase and polysporin never given? & muscle relaxer

(Doc. 111). The court instructed the jury that it could not answer questions about the evidence, and the jury returned a verdict for Council. (Doc. 112).

### D. The Rule 50(b) / Rule 59 motion

Under Rule 50(b), Wexford renews its Rule 50(a) motion on both fronts: (1) Council cannot establish that a single decision of Dr. Rahming constitutes a policy, custom, or practice of Wexford Health, and (2) Council failed to present evidence that Dr. Rahming acted with deliberate indifference. (Doc. 122, pp. 7-44). Alternatively, Wexford Health asks for a new trial under Rule 59 because, among other reasons, Council unfairly shifted his theory of liability throughout trial and the verdict is against the great weight of the evidence. (*Id.*, pp. 44-57).

In response, Council again bounced back-and-forth among theories. He first disavowed the 'failure to give oxycodone' theory of deliberate indifference that he put in the pretrial order and gave during opening statement:

> Defendant repeatedly argues, or implies, that Mr. Council's complaint was that he was not prescribed Oxycodone for his pain.

> For example, at p. 39 of its brief (Doc. 122), it asserts: 'Council bases his deliberate indifference claim on the fact that Dr. Rahming was aware of discharge instructions from UAB, an outside facility, that Council be prescribed Oxycodone, along with several other medications, the majority of which were in fact prescribed by Dr. Rahming.'
>
> The fact that he was prescribed a stronger pain medication than ibuprofen or acetaminophen by the doctors, including trauma specialists, who treated him at UAB is evidence of the severity of his pain and the need to address it. The UAB prescription said it should be provided if his pain was moderate (Joint Ex. 33), but that does not mean that plaintiff is complaining that he did not receive that particular medication. Rather, his complaint is that he was not given adequate medication to effectively treat his pain, which was at least moderate and generally severe for the three weeks in question.

(Doc. 123, p. 12) (highlighting added). Council also said that "[t]he facts, viewed from plaintiff's perspective and that of the jury," included "He was seen by Dr. Rahming the next day [February 2, 2021] and prescribed ibuprofen, the first pain relieving medication he received following his arrival at Kilby, late that afternoon." (*Id.*, pp. 4-5). So again Council repudiated the only two theories that he said he would prove in the pretrial order.

Instead, Council argued that "his discharge by Rahming [on February 2] and failure to provide sufficient medication to address the pain plaintiff complained of, is evidence of deliberate indifference to that pain since Rahming knew of his injuries, his condition, and what he had suffered through prior to his arrival at Kilby." (*Id.*, p. 13). Council reiterated the early discharge argument later: "A reasonable jury could conclude, as this jury clearly did, that discharging a victim of a life-threatening beating resulting in cracked bones, an eye swollen shut, a number of sutures and various other bruises three days after the assault took place was evidence of deliberate indifference." (*Id.*, p. 14). Council also pointed out that, after he arrived at Kilby in "ten out of ten" pain on February 1, he "did not receive any medication until late the next day." (*Id.*).

—

To sum up, in the pretrial order, Council abandoned the two fact disputes that survived summary judgment. Council then abandoned the two theories he put in the pretrial order about halfway through trial. Council has thus left the court with the difficult task of applying the evidence to ever-changing theories.

## III.

## STANDARDS OF REVIEW

Wexford Health's motion requires the court to apply three rules of civil procedure. The court quotes each rule and sets out its standard below.

### A. Rule 16

Rule 16 provides in relevant part:

> (d) PRETRIAL ORDERS. After any conference under this rule, the court should issue an order reciting the action taken. This order controls the course of the action unless the court modifies it.
>
> (e) FINAL PRETRIAL CONFERENCE AND ORDERS. The court may hold a final pretrial conference to formulate a trial plan, including a plan to facilitate the admission of evidence. The conference must be held as close to the start of trial as is reasonable, and must be attended by at least one attorney who will conduct the trial for each party and by any unrepresented party. The court may modify the order issued after a final pretrial conference only to prevent manifest injustice.

The advisory committee notes to Rule 16 says: "Counsel bear a substantial responsibility for assisting the court in identifying the factual issues worthy of trial. If counsel fail to identify an issue to the court, the right to have the issue tried is waived." Notes of Advisory Committee on Rules, 1983 Amendment. The Eleventh Circuit has held that district courts can enforce Rule 16(d)'s mandate that the pretrial order controls the trial unless the court modifies it under Rule 16(e) to prevent a manifest injustice. *See Morro, supra, Walker v. Anderson Elec. Conn.*, 944 F.2d 841, 843-44 (11th Cir. 1991).

16

**B. Rule 50(b)**

Rule 50(b) provides:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:
>
> (1) allow judgment on the verdict, if the jury returned a verdict;
>
> (2) order a new trial; or
>
> (3) direct the entry of judgment as a matter of law.

When considering a motion for judgment as a matter of law under Rule 50(b)(3), the court views the evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. *See Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 724 (11th Cir. 2012). Judgment as a matter of law is appropriate if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the" nonmoving party. Fed. R. Civ. P. 50(a). "Only the sufficiency of the evidence matters; what the jury actually found is irrelevant." *Hubbard*, 688 F.3d at 724.

**C. Rule 59(a)**

Rule 59(a)(1) provides:

> (1) GROUNDS FOR NEW TRIAL. The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows:
>
>> (A) after a jury trial, for any reason for which a new trial has

17

> heretofore been granted in an action at law in federal court; or
>
> (B) after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court.

The court "should grant a motion for a new trial when the verdict is against the clear weight of evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quotations omitted).

## IV.

## DISCUSSION

While the Eighth Amendment forbids the Government from inflicting cruel and unusual punishment, it is not self-executing. So Congress passed the Civil Rights Act, 42 U.S.C. § 1983, to allow a person to sue another "person" for depriving his Constitutional rights while acting under color of any state "statute, ordinance, regulation, custom, or usage." In *Monell v. Dep't of Soc. Services*, 436 U.S. 658 (1978), the Supreme Court held that cities and other local government entities can be a "person" subject to being sued under § 1983, but the plaintiff must show that the act alleged to be unconstitutional implemented or executed stemmed from an official policy or custom of the city or local government. *See also Pembaur*, 475 U.S. at 480-81.

In his only count against Wexford Health, Council alleges that Wexford Health is liable to him under § 1983 because, even though Wexford Health is a private entity, it was acting as the government when it inflicted cruel and unusual punishment on him. *See Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310 (11th Cir. 2011). As for the policy requirement, Council alleges that Wexford Health delegated all authority for medical decisions at Kilby prison to Dr. Rahming, making his decisions about Council's medical care the official policy of Wexford Health, even if Dr. Rahming might treat another Kilby inmate differently. *See Pembaur*, 475 U.S. at 481 (a final decisionmaker's action "tailored to a particular situation and not intended to control decisions in later situations" may lead to be *Monell* liability). In other words, if Dr. Rahming violated Council's Eighth Amendment rights, then so did Wexford Health

18

because its authorized decisionmaker caused the violation. *Id.* ("If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood.").

Putting it all together: Council alleges that, because Dr. Rahming was Wexford's ultimate decision maker, Wexford Health is liable for Dr. Rahming's acts of deliberate indifference to Council's serious medical needs. *See id.; Estelle v. Gamble*, 429 U.S. 97, 105 (1976). To prove his deliberate indifference claim, Council had to show: (1) Council had a serious medical need; (2) Dr. Rahming was deliberately indifferent to that need; and (3) Dr. Rahming's indifference injured Council. *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). Under the second element (deliberate indifference), Council had to prove that Dr. Rahming acted with criminal recklessness by showing that Dr. Rahming was subjectively aware that his own act or omission put Council at substantial risk of serious harm. *Wade*, 106 F.4th at 1255-58. And to attribute Dr. Rahming's acts or inactions to Wexford Health, Council had to prove under state law that Wexford Health delegated final decision-making authority to Dr. Rahming and retained no oversight of his decision.

Wexford Health argues that it is entitled to judgment under Rule 50(b) because Council failed to offer legally sufficient evidence on three of the requirements mentioned above:

1. Dr. Rahming was deliberately indifferent to Council's medical needs;
2. Dr. Rahming was Wexford Health's final decisionmaker; and,
3. Dr. Rahming's violative act or omission stemmed from a Wexford policy or custom.

Because the court agrees with Wexford Health on the first of these arguments, it does not address the other two.

While Wexford Health limits its sufficiency of the evidence argument to Council's claim that Dr. Rahming's failure to prescribe oxycodone was deliberately indifferent—*i.e.*, the theory Council pleaded in the pretrial order— the court broadens its review to *all* of Council's theories in case Council argues on appeal that this court wrongly enforced its pretrial order under Rules 16(d)

and 16(e). *Cf. Morro*, 117 F.3d at 515 ("We ascribe to the trial court a broad discretion to preserve the integrity and purpose of the pretrial order. We have explained that a district court should not 'for fear of appellate correction, be forced into an overbroad interpretation of such orders.'") (cleaned up).

## A. Acts or omissions pleaded in the pretrial order

The court starts with the acts or omissions Council put in the pretrial order. Again, the court allowed Council to write his own claim for trial:

> (c) <u>Plaintiff's Claims (as written by Plaintiff)</u>.
>
> 1. Mr. Council claims that from February 1, 2021 through February 22, 2021, while incarcerated at the Kilby Correctional Facility that he was not provided appropriate pain medications for his necessary medical needs and that Wexford had a policy to not provide pain medications and was deliberately indifferent to Mr. Council's necessary medical needs and violated Mr. Council's constitutional rights in violation of 42 U.S.C § 1983. Specifically, Mr. Council alleges that he had been beaten so severely by prison guards that he was unconscious and unresponsive in the prison infirmary, and was therefore airlifted to UAB. Mr. Council alleges that he had been prescribed, among other medications, Oxycodone for pain to be taken as needed. After arriving at Kilby, he reported severe pain to the nursing staff and requested more substantial pain medication than acetaminophen. Mr. Council alleges that Dr. Rahming was told of Mr. Council's complaints, but never examined him and did not prescribe the stronger pain medication he had been prescribed by doctors at UAB hospital, causing him unnecessary pain. He further maintains and alleges that Dr. Rahming had been delegated policy making authority for medical decisions at Kilby and therefore, his decisions constituted Wexford policy.

(Doc. 95, p. 4) (highlighting added). Read broadly in a light most favorable to Council, Council preserved two fact disputes for the jury to decide at trial: (1) should Dr. Rahming have prescribed Council with the "stronger pain

medication" that UAB doctors prescribed (*i.e.*, oxycodone), and (2) did Dr. Rahming ever examine Council, after having being told about Council's reports of severe pain? The court address each separately.

### 1. Dr. Rahming's refusal to provide oxycodone

a. *Waiver:* For starters, Council has progressively distanced himself from the oxycodone-based claim that he wrote for the pretrial order, starting with his argument against Wexford Health's Rule 50(a) motion, *see* (doc. 121, pp. 116-17), and culminating with this full-throated repudiation of an oxycodone-based theory in his brief opposing the present Rule 50(b)/59(a) motion:

> Defendant repeatedly argues, or implies, that Mr. Council's complaint was that he was not prescribed Oxycodone for his pain. For example, at p. 39 of its brief (Doc. 122), it asserts: "Council bases his deliberate indifference claim on the fact that Dr. Rahming was aware of discharge instructions from UAB, an outside facility, that Council be prescribed Oxycodone, along with several other medications, the majority of which were in fact prescribed by Dr. Rahming."
>
> The fact that he was prescribed a stronger pain medication than ibuprofen or acetaminophen by the doctors, including trauma specialists, who treated him at UAB is evidence of the severity of his pain and the need to address it. The UAB prescription said it should be provided if his pain was moderate (Joint Ex. 33), but that does not mean that plaintiff is complaining that he did not receive that particular medication. Rather, his complaint is that he was not given adequate medication to effectively treat his pain, which was at least moderate and generally severe for the three weeks in question.

(Doc. 123, pp. 11-12) (highlighting added). To the extent that Council can waive the oxycodone-based claim that he pleaded in the pretrial order, the court finds that he has.

b. *The evidence:* The court also finds that judgment is warranted under Rule 50(b) because, even viewed in a light most favorable to Council, the trial evidence cannot support a finding that Dr. Rahming acted with criminal recklessness when he chose not to give Council oxycodone. In his opposition, Council now acknowledges that Dr. Rahming prescribed him over-the-counter pain medications and that nurses gave him those medicines several times. *See* (doc. 123, pp. 4-5) (Council's statement of the facts found by the jury). So Council's argument boils down to his disagreement with Dr. Rahming's decision to limit him to over-the-counter pain medications like Tylenol, Motrin, and Advil, rather than oxycodone. (*Id.*, p. 12) ("his complaint is that he was not given adequate medication to effectively treat his pain").

Dr. Rahming was the only doctor who testified, meaning that the jury had no opinion evidence that Dr. Rahming's judgment on the type and amount of pain medication to give Council was flawed, much less criminally reckless under *Wade*. Council instead relies on UAB's February 1st recommendation that Council be given oxycodone after discharge:

Discharge Medications:
Outpatient Medications
- acetaminophen (acetaminophen 325 mg oral tablet) 650 mg - Oral - Every 6 hr
- bacitracin-polymyxin B topical (Polysporin 500 units-10,000 units/g topical ointment) 1 app - TOP - BID to facial sutures until healed
- methocarbamol (methocarbamol 500 mg oral tablet) 500 mg - Oral - QID
- tamsulosin (Flomax 0.4 mg oral capsule) 0.4 mg - Oral - Daily

(PRN Medications)
- oxyCODONE (oxyCODONE 5 mg oral tablet) 5 mg - Oral - Every 6 hr PRN (Pain, Moderate (4-6))

(Doc. 119-33, p. 1). But UAB's discharge recommendation does not help Council prove that Dr. Rahming acted with criminal recklessness. As shown in the red circles, UAB separated oxycodone from other medicines as a "PRN medication," meaning a medication to give only if needed.[4] So even viewed in a light most favorable to the jury's verdict, UAB considered the decision to give oxycodone differently than acetaminophen. Oxycodone was to be given only if needed, meaning that UAB left the decision to Council's next caretaker, Dr. Rahming.

---

[4] "PRN" is short for *pro re nata*, which means "as needed" when used in medical prescriptions. "Pro re nata," Merriam-Webster.com Dictionary (last viewed March 24, 2026).

Council judicially admits that Dr. Rahming examined him the day after UAB wrote the discharge recommendations, February 2, 2021:

> The facts, viewed from plaintiff's perspective and that of the jury, are as follows:
>
> …
>
> 7. He was seen by Dr. Rahming the next day and prescribed ibuprofen, the first pain relieving medication he received following his arrival at Kilby, late that afternoon.

(Doc. 123, p. 4-5). When he testified, Council did not acknowledge seeing Dr. Rahming (though Council's attorney later did), so the only evidence the jury received about the February 2nd exam came from Dr. Rahming. Dr. Rahming testified that, in his professional opinion, Council did not need oxycodone on top of acetaminophen and ibuprofen because (a) Council's pain level did not warrant the upgrade, and (b) Dr. Rahming was concerned about introducing more opiates into the prison via an inmate he suspected of illicit drug use. Dr. Rahming's contemporaneous report supports both of these assertions:

| Admission Diagnosis: | | Admission Date: | Admitting Provider: |
|---|---|---|---|
| s/p Blunt Trauma OS | | 2/1/2021 | Dr. Rahming |
| **History** | | | |
| Chief Complaint: 46 y/o AAM @UAB 01/30/2021 - 02/01/2021 2o above | | | |

HPI:

He sustained multiple superficial injuries to head, the above but no intracranial abnormalities or orbital Fx noted. He was seen in consultation by OS and Opthalmology. He was initially intubated. Ventilator was weaned, he remain stable and was discharged. He is currently doing well. He was suspected of illicit drug use.

PMH:
As above

| **Vital Signs** | | | | | |
|---|---|---|---|---|---|
| T: 96.7 | P: 98 | R: 12 | BP: 123/71 | O2 Sat: 100% | on RA |
| Height: 68" | Weight: 160 lbs | | Pain Scale: 3 /10 | Location: | |
| | | | **Physical Exam** | | |
| General Appearance: WDWN, NAD, nontoxic | | | | | |

23

(Doc. 119-35, p. 1) (circles added). Right or wrong, contemporaneous evidence jointly introduced by the parties shows that Dr. Rahming subjectively believed that Council was not in distress physically ("NAD") and suffering from a 3/10 level of pain when Dr. Rahming decided against prescribing oxycodone. And Council presented no evidence that Dr. Rahming was ever told that Council's situation worsened. So even assuming that the jury found that Dr. Rahming underappreciated Council's level of pain, and thus undermedicated Council, that finding does not overcome Dr. Rahming's *subjective belief* that Council's pain was not severe enough to warrant oxycodone, especially in light of Dr. Rahming's suspicion that Council used illicit drugs. The court therefore finds that no evidence supports a finding that Dr. Rahming subjectively knew that his decision to give Council Advil, Motrin, or Tylenol, but not oxycodone, put Council "at substantial risk of serious harm[.]" *Wade*, 106 F.4th at 1255.

c. *Precedent*: The Circuit Court has reached the same result with similar facts. In *Adams v. Poag*, for example, an inmate died from an asthma attack while being transported from his detention facility to an outpatient clinic. 61 F.3d 1537 (11th Cir. 1995). Among other claims, Adams' family argued that the physician's assistant (PA) who ordered the transport was deliberately indifferent to Adams' serious medical needs because the PA didn't "administer stronger medication to Adams pending the arrival of the ambulance[.]" Following the magistrate judge's recommendation, the district court denied the PA's request for summary judgment based on qualified immunity. The Circuit Court reversed, stating "[o]bviously, such a determination is a medical judgment and, therefore, an inappropriate basis for imposing liability under section 1983." *Id.* at 1547.

About a year ago, in an unpublished opinion, the Circuit Court cited *Adams* to affirm the granting of summary judgment against a claim much like Council's. *See Collins v. Ferrell*, 2024 WL 4677418 (11th Cir. Nov. 5, 2024). Inmate Collins injured his knee before he was incarcerated. His knee pain became so intense that the prison medical director, Dr. Ferrell, referred Collins to an orthopedic surgeon, Dr. Winchell. Dr. Winchell performed two knee surgeries on Adams about a year apart. Each time, Dr. Winchell (the surgeon) recommended Tylenol #3, which contains an opioid. Both times, Dr. Ferrell (the prison medical director) let Adams' Tylenol #3 prescription lapse and

switched Adams to naproxen and Neurontin, both non-opioids, rather than continue Tylenol #3. Adams sued Dr. Ferrell under § 1983. The district court granted Dr. Ferrell summary judgment, and the Circuit Court affirmed. Citing *Adams*, the court found that "Dr. Ferrell's decision not to prescribe Tylenol #3 was a reasonable medical judgment that cannot form the basis for liability." *Id.* at *6. The court went on to discuss the doctor's differing opinions:

> Lastly, Dr. Ferrell's decision to deviate from Dr. Winchell's pain medication recommendations does not support Collins's deliberate indifference to medical needs claim. As an initial matter, Dr. Winchell often noted that he was making a recommendation, but that Dr. Ferrell would make the final determination on how to manage Collins's pain. Although Collins preferred Dr. Winchell's recommendations, the Eighth Amendment does not require Dr. Ferrell to abandon his own medical judgment in favor of that of another doctor's. *Waldrop*, 871 F.2d at 1033 ("[A] simple difference in medical opinion" does not constitute deliberate indifference.). The district court properly granted summary judgment for Dr. Ferrell on Collins's claim of deliberate indifference for not prescribing Tylenol #3.

*Id.* (highlighting added).

The same is true here. While UAB recommended oxycodone, it was up to Dr. Rahming to decide whether to administer it. Quoting the Circuit Court, "the Eighth Amendment [did] not require [Dr. Rahming] to abandon his own medical judgment in favor of that of another's doctor." *Id.* "'A simple difference in medical opinion' does not constitute deliberate indifference." *Id.* quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989).

—

In sum, assuming Council has not waived his oxycodone-based claim, judgment is still due under Rule 50(b) for either of two reasons. First, Circuit precedent dictates that failing to give an inmate's chosen medicine does not amount to actionable deliberate indifference, even if another doctor agrees with the inmate's choice. *See Adams, supra*; *Collins, supra*. Second, Council

presented no evidence that would support a finding that Dr. Rahming was subjectively aware that his decision to prescribe Council with Advil, Motrin, and Tylenol, rather than an opioid, subjected Council to a "substantial risk of serious harm[.]" *Wade*, 106 F.4th at 1255. So even if the jury could find that Dr. Rahming acted unreasonably or negligently, no evidence supports the finding of criminal recklessness required by *Wade*.

## 2. Failure to examine Council

In the pretrial order, Council said that he would prove that "Dr. Rahming was told of Mr. Council's complaints, but never examined him and did not prescribe the stronger pain medication he had been prescribed by doctors at UAB hospital, causing him unnecessary pain." (Doc. 95, p. 4) (highlighting added). If the highlighted allegation preserved a fact question about deliberate indifference distinct from the failure to prescribe oxycodone, the court grants judgment against it under Rule 50(b) for two reasons.

a. *Judicial admission*: Council now admits Dr. Rahming saw Council. During closing argument, Council's attorney told the jury that Dr. Rahming examined Council and his subsequent treatment of Council was aloof:

> And, frankly, he may have been seen by Dr. Rahming. I don't know that he was treated by him. What happened was he looked at him and said, oh, he's stable, you know, I am going to discharge him. And then he forgot about him until three weeks later when he said oh, gee, we're supposed to have him back at UAB in five to seven days and nothing happened.

(Doc. 121, p. 142). And in his opposition brief to the present motion, Council says that the facts "viewed from plaintiff's perspective and that of the jury," show that "[h]e was seen by Dr. Rahming the next day and prescribed ibuprofen[.]" (Doc. 123, p. 4). These statements bind Council.

An attorney can admit a previously disputed fact and thus eliminate the need for trial or a court ruling:

> In the trial of a cause the admissions of counsel, as to matters to be proved, are constantly received and acted upon. They may

> dispense with proof of facts for which witnesses would otherwise
> be called. They may limit the demand made or the set-off claimed.
> Indeed, any fact, bearing upon the issues involved, admitted by
> counsel, may be the ground of the court's procedure equally as if
> established by the clearest proof. And if in the progress of a trial,
> either by such admission or proof, a fact is developed which must
> necessarily put an end to the action, the court may, upon its own
> motion, or that of counsel, act upon it and close the case.

*Oscanyan v. Arms Co.*, 103 U.S. 261, 263 (1880). "Indeed, facts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them." *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1178 (11th Cir. 2009) quoting *Hill v. Federal Trade Comm'n*, 124 F.2d 104, 106 (5th Cir. 1941). "The general rule is that a party is bound by the admissions in his pleadings." *Id.* at 1177 quoting *Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir.1983) (cleaned up); *see also Young & Vann Supply Co. v. Gulf Florida & Alabama Ry. Co.*, 5 F.2d 421, 423 (5th Cir.1925) ("We may consider the statements in the brief as admissions of facts."). Attorneys can also judicially admit facts in their opening and closing statements to the jury. *See, e.g.*, *United States v. Blood*, 806 F.2d 1218, 1221 (4th Cir. 1986) ("a clear and unambiguous admission of fact made by a party's attorney in an opening statement in a civil or criminal case is binding upon the party").

Because Council's attorney told the jury during trial and this court after trial that Dr. Rahming saw Council on February 2, 2021, it is "beyond the power of evidence" to contradict these admissions and support the jury's verdict. *Cooper*, 575 F.3d at 1178.

b. *The evidence*: All of the evidence supports Council's judicial admission. During his case-in-chief, Council did not testify that Dr. Rahming did not examine him, and Council was non-committal when asked to confirm that Dr. Rahming removed his stitches. (Doc. 120, p. 103) ("Somebody took them out eventually."). Dr. Rahming, however, unequivocally testified that he examined Council on February 2, *see* (doc. 121, pp. 35-40), and the parties jointly moved into evidence his report from that exam. (Doc. 119-35). When Council was re-called as a rebuttal witness, he was not asked whether Dr. Rahming lied or

was mistaken about the February 2 exam. So the court finds that no evidence supports a verdict that Dr. Rahming was deliberately indifferent because he failed to examine Council.

—

Council was warned. In his summary judgment recommendation, the magistrate judge cited four Eleventh Circuit opinions that held a "difference in professional opinions" about how to treat/medicate a patient does not support a § 1983 deliberate indifference claim. (Doc. 77, pp. 39-40). Yet the magistrate judge recommended that the case proceed to trial because Council testified that Dr. Rahming failed to prescribe Council *any* pain medication, not the wrong medication. (*Id.*, p. 40). In the pretrial order, Council chose to shift his claim away from his viable theory of 'no medication' to the 'wrong medication' theory that Council was told would lead to judgment for Wexford Health.

As explained, Council presented no evidence at trial that makes the claim of deliberate indifference that Council included in the pretrial order viable—just as no evidence supported that claim at the Rule 56 stage. Because Rules 16(d) and 16(e) limit the trial to the issues chosen and identified by the parties, *see Morro, supra*, the court must therefore **GRANT** Wexford Health's Rule 50(b) motion for judgment on the only count against it. That should end the court's opinion. But the court discusses the other theories of deliberate indifference that Council has mentioned during this litigation in case Council argues on appeal that he should not be bound by the theory of his claim that he wrote for the pretrial order.

## B. Acts or omissions <u>not</u> pleaded in the pretrial order

The court briefly addresses other acts or omissions that Council has likened to deliberate indifference during the litigation, starting with the two that prevented the court from granting summary judgment.

### 1. Failure to give any medication

Council told that jury that, when he asked for pain medication, "[t]he nurses stated that he [Dr. Rahming] wouldn't write nothing for pain so they couldn't give me nothing for pain, and that's all I had to go off of." (Doc. 120, p.

98). So if the court found that the jury could have based its verdict on the 'no medication' theory that survived summary judgment, the court would usually be required to grant a new trial under Rule 59(a), rather that judgment as a matter of law under Rule 50(b), because even though the great weight of evidence shows that Dr. Rahming prescribed pain medication, and nurses gave Council pain medication at least six times[5], the court could not judge the credibility of Council's testimony. But the court can (and does) grant judgment for Wexford Health, despite Council's testimony, for two reasons.

a. *Judicial Admission*: As explained, a civil plaintiff is bound by the admissions of his lawyer. *See Cooper*, 575 F.3d at 1178. Council's attorney told the jury during his first closing argument that Dr. Rahming prescribed Council pain medication at 6:48pm on February 2. (Doc. 121, p. 135). And Council told the court in his opposition to the present motion that the jury found that Dr. Rahming prescribed Council ibuprofen on February 2. (Doc. 123, pp. 4-5). Council is bound by these admissions, meaning that Council cannot argue that his testimony that he was neither prescribed nor given pain medication supports the jury's verdict. *See Cooper*, 575 F.3d at 1178 ("Indeed, facts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them.").

b. *Rule 16*: Again, Rule 16 and Eleventh Circuit precedent dictate that only those claims Council pleaded in the pretrial order are allowed at trial. *See Morro, supra*. Council waived every other theory. This case is a prime example why district courts should enforce the rule.

---

[5] The court assumes, as it must, that Council truthfully testified that Nurse Fuller gave him Motrin or similar medication on February 12, 2021 (doc. 120, pp. 93, 104), despite the interaction with Nurse Fuller not being recorded on Council's MAR alongside the other five times that nurses gave Council pain medication. (Doc. 119-31). In fact, Nurse Fuller's February 12 "Progress Note" supports Council's testimony. (Doc. 119-38). Dr. Rahming's original prescriptions expired on February 6 (acetaminophen) and February 8 (ibuprofen) because Dr. Rahming expected Council to be re-examined after his return from the UAB eye clinic—a trip that did not occur. (Docs 119-9, 119-31). So when Nurse Fuller encountered Council at 9:10am on February 12, 2021 (doc. 119-38, p.1), she would have rightly said that Dr. Rahming had not prescribed Council any pain medication. That's presumably why Nurse Fuller recorded her production of acetaminophen under the "Nursing Intervention" section of the Progress Note (*id.*), rather than record it on Council's MAR (doc. 119-31). Plus, Nurse Fuller's handwritten note of "5 days" matches the second line of Ibuprofen on Council's MAR starting on February 12, 2021. *Compare* (doc. 119-38, p. 2) *with* (doc. 119-31). In short, the evidence supports both Council's memory of his interaction with Nurse Fuller *and* the MAR's depiction of five other times that different nurses supplied Council with acetaminophen or ibuprofen.

Wexford Health, from the first sentence of its opening statement, raised the 'no medication' fact theory that Council pleaded in his complaint to fight against it:

> When this complaint was filed by Mr. Council in this case, the legal complaint stated that for the next three weeks from February 1 to February 22, Plaintiff, being Mr. Council, did not see any medical personnel, and then, I took his deposition, and you will see his deposition, Mr. Council denied ever seeing any doctors or any nurses or receiving any medication at all. That's his allegations, and it's simply not true.

(Doc. 120, p. 66). The parties were still bickering about the complaint in front of the jury during closing arguments:

> I note by the way, again, what I'm telling you is my suggestions, but lawyer -- what lawyers tell you is not evidence. The fact that Mr. Piggott cross-examined Robert Earl and said, didn't you say this or that, didn't the complaint say this or that, the complaint is not in evidence. The complaint is just a way to get in court.

(Doc. 121, p. 137) (Council's first closing argument). Rule 16(d) says that the pretrial order, not the complaint or the summary judgment opinion, "controls the course of the action unless the court modifies it." The court allowed Council to write his theory of the claim in the pretrial order; he chose to omit the 'no medication' fact theory that he pleaded in the complaint; and, he did not subsequently ask the court to add that theory to the pretrial order. As a result, Council waived the 'no medication' fact question, so it cannot support the jury's verdict. *See* Fed. R. Civ. P. 16, Notes of Advisory Committee on Rules, 1983 Amendment ("Counsel bear a substantial responsibility for assisting the court in identifying the factual issues worthy of trial. If counsel fail to identify an issue to the court, the right to have the issue tried is waived.").

### 2. Dr. Rahming's unreasonable delay

At the summary judgment stage, the magistrate judge and this court opined that Council might prove deliberate indifference if Dr. Rahming could not explain his alleged 24+ hour delay in treating Council, despite knowing

about Council's serious injuries. (Doc. 79, p. 3) (citing *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) ("[A]n unexplained delay of hours in treating a serious injury states a prima facie case of deliberate indifference."); *see also Adams*, 61 F.3d at 1544 (delays in medical treatment "that [are] tantamount to unnecessary and wanton infliction of pain[ ] may constitute deliberate indifference"). The 'unreasonable delay' fact theory cannot support the jury's finding of deliberate indifference for two reasons.

a. *Rule 16*: Council did not plead the 'unreasonable delay' theory in the pretrial order; he instead wrote that he would prove that "Dr. Rahming was told of Mr. Council's complaints, *but never examined him* and did not prescribe the stronger pain medication he had been prescribed by doctors at UAB hospital, causing him unnecessary pain." (Doc. 95, p. 4) (emphasis added). Council thus waived 'unreasonable delay' as a fact question, making it unavailable to support the jury's verdict. *See* Fed. R. Civ. P. 16; *Morro*, *supra*.

b. *Not supported by evidence*: If Council had not waived this fact theory, the court would grant judgment against him under Rule 50(b). Records show, and Council does not dispute, that Council arrived at Kilby at 4:30pm on February 1, 2021. (Docs. 119-1, 119-34). From there, Dr. Rahming explained to the jury:

> Q. Okay. And how did you admit him to the infirmary?
>
> A. Well, so he comes back at 4:30 in the afternoon after I was not at the facility. The nurses will check him in. They will go over his injuries. They will do the body chart as you saw. They would make an assessment. They would call me and tell me that UAB had sent him back with these instructions and these different things. I follow that. I come in the next day. I see him. I evaluate him for myself to verify that he's in a stable condition and that he's doing well.
>
> Q. So you admit him to the infirmary based upon what the nurses told you?
>
> A. Yes.
>
> Q. Not upon your evaluation?

> A.  No. We have to admit them. Every time they come from the hospital we have to admit them to our infirmary. That's our rule.

(Doc. 121, p. 68). Dr. Rahming arrived at Kilby the next day and examined Council at 11:32am. (Doc. 119-35). Dr. Rahming recommended Council be given "analgesics" (painkillers) in his 11:32am report (*id.*; doc. 121, p. 38); Dr. Rahming faxed prescriptions for acetaminophen and ibuprofen to the pharmacy that day (doc 119-9); and, Council judicially admits in his opposition to the present motion that he received medication from that prescription later that night. (Doc. 123, pp. 4-5).

Council presented no testimony or documents that contradicted Dr. Rahming's recollection of his actions on February 1-2. Even if you view those actions in a light most favorable to Council, Dr. Rahming's acts do not rise to the level of criminal recklessness required by *Wade*. There is no evidence that Dr. Rahming was told that Council was in serious distress that required prompt attention after Council's initial 4:30pm intake. Council points to nurse Cain-Whiting's 11:00pm report that says Council complained of "10/10" pain in his eye and ribs. (Doc. 119-3). Nurse Cain-Whiting testified that she told Dr. Rahming that Council complained of 10/10 pain, but she could not recall *when* she told him. (Doc. 121, p. 97). Her report says that she "will follow up with provider" and that she "educated" Council about "pain control." (Doc. 119-3, p.2). Even assuming her report is wrong—*i.e.*, assuming Cain-Whiting did not tell Council that he could request medicine and she immediately called Dr. Rahming at home at 11:00pm, rather than "follow up" the next day—no evidence supports a finding that Dr. Rahming subjectively believed that his failure to immediately examine and medicate Council, rather than wait until he personally examined him the next morning, put Council at "substantial risk of serious harm" during the intervening hours. *Wade*, 106 F. 4th at 1258.

### 3. Dr. Rahming's failure to prescribe methocarbamol

Methocarbamol is a muscle relaxer that UAB listed in Council's "discharge medications." (Doc. 119-33, p. 1). Dr. Rahming testified that he prescribed methocarbamol for Council. (Doc. 121, p. 22). But that prescription

was not included in the joint exhibits, and methocarbamol is not listed on Council's MAR as an available prescription. (Doc. 119-31). Starting with his argument against Wexford Health's Rule 50(a) motion, and continuing through post-trial briefing, Council has argued that Dr. Rahming testified falsely about giving Council methocarbamol. To the extent that Council tries to support the jury's verdict with this discrepancy, Council's argument fails to avoid judgment against him for two reasons.

a. *Rule 16*: Council did not mention the failure to provide methocarbamol or any other muscle relaxer in the pretrial order. So Wexford Health was not on notice that it had to defend against this fact allegation, rather than the failure to provide oxycodone. The court thus finds that Council waived the fact question of whether the failure to prescribe and provide muscle relaxers amounts to deliberate indifference. *See* Fed. R. Civ. P. 16; *Morro*, *supra*.

b. *Insufficient evidence*: If Council had not waived this fact question, the court would also find that it cannot support a finding of deliberate indifference here. As explained, a difference in opinion between doctors about a patient's proper medication regime is not actionable under § 1983. And Council provides no evidence that would support a finding that Dr. Rahming subjectively knew that failing to provide Council with muscle relaxers put Council at "substantial risk of serious harm." *Wade*, 106 F. 4th at 1258.

### 4. Dr. Rahming's 'early discharge' decision

By rule, Council was placed in Kilby's infirmary upon arrival. After examining Council on February 2, Dr. Rahming cleared Council to be discharged from his care in the infirmary and given to DOC's care for placement within the facility. Council argued during his rebuttal closing argument that his discharge showed deliberate indifference (doc. 121, p. 142), and he makes the same argument in his post-trial opposition. (Doc. 123, p. 13) ("And his discharge by Rahming and failure to provide sufficient medication to address the pain plaintiff complained of, is evidence of deliberate indifference to that pain since Rahming knew of his injuries, his condition and what he had suffered through prior to his arrival at Kilby."). But Dr. Rahming's discharge decision cannot support the jury's verdict for two reasons.

a. *Rule 16*: Council did not plead this fact theory in the pretrial order, so Wexford Health had no notice that it had to defend against it. Council thus waived the 'early discharge' theory of deliberate indifference. *See* Fed. R. Civ. P. 16; *Morro, supra.*

b. *Insufficient evidence*: If Council had preserved the 'early discharge' fact theory, the court would still grant judgment against it under Rule 50(b). Even if you assume that Dr. Rahming knew that his decision allowed DOC to remove Council from the infirmary and place him elsewhere within Kilby, Council failed to prove that Dr. Rahming's decision injured him. As Council testified at trial, and his attorney judicially admits in post-trial briefing, DOC *didn't* move Council; he remained in the infirmary isolation cell next to the nurse's station all three weeks. *See* (doc. 123, p. 5) ("He was discharged by Rahming the next day, but remained in the medical unit at Kilby[.]"). Because Council judicially admits that he never moved, thereby admitting that he could not be injured by Dr. Rahming's discharge decision, the 'early discharge' fact theory cannot support the jury's verdict.

### 5. The missed follow-up appointment

Finally, Council argued to the jury in his rebuttal closing argument that Dr. Rahming's failure to ensure that Council was sent back to UAB for his follow-up eye appointment amounted to deliberate indifference:

> And, frankly, he may have been seen by Dr. Rahming. I don't know that he was treated by him. What happened was he looked at him and said, oh, he's stable, you know, I am going to discharge him. And then he forgot about him until three weeks later when he said oh, gee, we're supposed to have him back at UAB in five to seven days and nothing happened. Let's take look at the -- you know, you will see the urgent order for the 22nd, and you will see some physicians note about, oh, we didn't do that in five to seven days. That's not treatment.

(Doc. 121, p. 142). The 'missed follow-up' fact theory cannot support the jury's verdict for two reasons.

a. *Rule 16*: Council did not mention his missed follow-up in the pre-trial order, so Wexford Health was not on notice that it was a fact question to defend against at trial. Council thus waived this fact theory, and it cannot support the jury's verdict. *See* Fed. R. Civ. P. 16; *Morro*, *supra*.

b. *Insufficient evidence*: If Council had preserved the 'missed follow-up' fact theory, the court would still grant judgment against it under Rule 50(b). Dr. Rahming testified that he requested Council be sent back to UAB in one week. (Doc. 121, p. 76). But once Dr. Rahming discharged Council to DOC's control on February 2, he testified that he had no control over Council's transport. (*Id.*, pp. 71-76). Nor did Dr. Rahming know that Council was not transported or why he wasn't transported. (*Id.*, p. 76). Council presented no contradictory evidence. If Dr. Rahming neither controlled Council's transport to UAB for his follow-up, nor knew that Council was not transported to UAB for his follow-up, then Dr. Rahming cannot have subjectively known that his own action or inaction put Council at "substantial risk of serious harm." *Wade*, 106 F.4th at 1258.

—

To sum up, Council survived summary judgment by relying on his own testimony to create two fact disputes that could not hold up to the weight of the evidence. Rather than present that case to the jury, Council chose in the pretrial order to shift the factual dispute to a choice between two physicians' treatment plans—a factual dispute that the magistrate judge told Council would not survive a motion for judgment. So this outcome cannot be surprising.

Viewed in a light most favorable to the verdict, Council proved to the jury that Dr. Rahming was callous toward Council and the level of pain he was suffering. But callousness is not criminal recklessness. While the jury likely decided that Dr. Rahming should have given Council stronger or more frequent medication (as suggested by their questions why the MAR chart had no entries after February 12 and why it did not include the muscle relaxer), as the magistrate judge quoted for Council in his report and recommendation, the Circuit Court has said that § 1983 does not permit fact disputes between two provider's medical opinions:

35

> Bismark would have us conclude that Dr. Fisher was obliged to implement another doctor's treatment plan, even where that plan was in conflict with his own medical judgment. Nothing in our case law would derive a constitutional deprivation from a prison physician's failure to subordinate his own professional judgment to that of another doctor; to the contrary, it is well established that 'a simple difference in medical opinion' does not constitute deliberate indifference. *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989). Far from interfering with treatment once prescribed, Dr. Fisher was a physician who personally prescribed treatment for Bismark, albeit not that requested by Bismark. The Eighth Amendment did not compel Dr. Fisher to check his own medical training and judgment at the door, simply because he was informed that some other doctor at some other time had prescribed [a different course of treatment] for his patient.

(Doc. 77, p. 39-40, n. 32) (quoting *Bismark v. Fisher*, 213 F. App'x 892, 897 (11th Cir. 2007) (unpublished) (per curiam)). While Council and the jury may have preferred Dr. Rahming to follow UAB's prescription recommendations, the Eighth Amendment did not require him to. *Waldrop*, 871 F.2d at 1033. Nor did Council present any evidence that Dr. Rahming subjectively knew that his decision not to give Council an opioid, a muscle relaxer, or some other medication stronger than Tylenol, Advil, or Motrin put Council at "substantial risk of serious harm." *Wade*, 106 F.4th at 1258. So the jury's verdict, while well intentioned, cannot stand.

36

## CONCLUSION

For these reasons, the court **GRANTS** Wexford Health's Rule 50(b) motion for judgment and thus **DENIES AS MOOT** its Rule 59(a) motion for a new trial. Should a superior court find that this court wrongly granted judgment under Rule 50(b), this court would grant Wexford Health's Rule 59(a) motion for a new trial because (a) the jury's verdict is against the great weight of the evidence and (b) Council's shifting theories unfairly prejudiced Wexford Health, thus making its liability a manifest injustice. The court will enter a separate order that carries out this judgment.

**Done** and **Ordered** on March 24, 2026.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE